PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-2995
_____

DAOUD CHEHAZEH,

                         Appellant,

v.

ATTORNEY GENERAL OF THE UNITED STATES,
SECRETARY OF THE DEPARMENT OF HOMELAND
SECURITY,

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cv-05684)
District Judge:  Hon. Faith S. Hochberg

_____

Argued
June 21, 2011

Before:   CHAGARES, JORDAN, and GREENAWAY, JR.,
*Circuit Judges*.

(Filed: January 11, 2012)
_____

Lindsee P. Granfield
Jeffrey M. Rosenthal
Ashika Singh
Alida Lasker
Jane Pek
Nathaniel Jedrey
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, NY   10006

Lavi S. Soloway
Tanisha L. Massie   [ARGUED]
Masliah & Soloway, PC
225 Broadway - #1610
New York, NY   10036
     *Counsel for Appellant*

Tony West
David J. Kline
Theodore W. Atkinson
Leah A. Bynon
Erez Reuveni   [ARGUED]
United States Department of Justice
Office of Immigration Litigation
District  Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC   20044
     *Counsel for Appellees*

———————————

OPINION OF THE COURT

———————————

JORDAN, *Circuit Judge*.

Daoud Chehazeh appeals the May 24, 2010 order of the United States District Court for the District of New Jersey dismissing, for lack of jurisdiction, his "Petition for Writ of Habeas Corpus and Stay of Removal Proceedings."[1] Chehazeh had asked the District Court to declare that the decision of the Board of Immigration Appeals (the "BIA") to *sua sponte* reopen removal proceedings against him is contrary to law, and he sought an order requiring the BIA to

---

[1] Although Chehazeh titled his petition as one for "habeas corpus" relief, it in fact requests other forms of relief also, as outlined *infra* Part I(B)(3).

3

terminate the reopened proceedings. Because we conclude that, under these unusual circumstances, the District Court has jurisdiction to review the BIA's decision pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., we will reverse the District Court's order and remand for further proceedings.

## I.    Background

### A.    Factual History[2]

Chehazeh is a Syrian native and citizen who, prior to 1999, lived in Damascus and worked as a travel agent. As part of his business, Chehazeh helped his customers to obtain Saudi Arabian work visas through his contacts in the Saudi Arabian embassy. In 1999, one of those contacts allegedly defrauded Chehazeh of 7 million Syrian lire that Chehazeh had paid to obtain visas. Chehazeh was left indebted to his customers and so borrowed 3.5 million lire from several moneylenders to help meet those debts. Soon afterwards, he travelled to Saudi Arabia to confront the person he believed had defrauded him. After failing in that attempt, he came to the United States rather than returning to Syria. He was admitted to this country on July 3, 2000, on a non-immigrant visa that authorized him to stay here until January 2, 2001.

---

[2] We present the facts as stated in Chehazeh's testimony at his removal hearing and in his sworn affidavit. Although the Immigration Judge found Chehazeh credible, the BIA reopened Chehazeh's removal proceedings based, in part, on questions about the Immigration Judge's impartiality. We do not, therefore, rely on that credibility finding and draw no conclusions about the veracity of Chehazeh's statements.

His family in Syria subsequently informed him that his creditors were pursuing legal action against him and had put a lien on his house. Chehazeh claims he was afraid that if he returned to Syria, he would be put in jail, and so he stayed in the United States after the expiration of his visa.

Chehazeh settled in Northern Virginia and began attending the Dar al Hijra mosque in Falls Church. Through that affiliation, he became acquainted with two Saudi men named Hanji Hanjour and Nawaf al-Hazmi, who told him that they were in the United States studying to become pilots. On at least one occasion, Hanjour and al-Hazmi visited Chehazeh in his apartment. On September 25, 2001, while watching news coverage of the September 11, 2001 attacks, Chehazeh recognized pictures of Hanjour and al-Hazmi and heard that they were two of the individuals suspected of perpetrating the attacks. Chehazeh "felt compelled to tell the U.S. authorities everything [he] knew about Hanjour and Hamzi [sic]." (App. at 41.) As a result, he made several attempts to contact the FBI, but his efforts were impeded by his inability to speak English. Finally, on September 28, 2001, he was able to communicate with someone at the FBI and, during an interview that day, provided FBI agents with the information he had regarding Hanjour and al-Hazmi. The FBI brought him in for additional questioning on October 1, 2001, after which – no doubt to his distress – he was detained and placed in the custody of the Immigration and Naturalization Service ("INS").

## B.    Procedural History

### 1.    *The IJ Decision and the Dismissal of the INS's Appeal*

On October 19, 2001, the INS issued a Notice to Appear charging Chehazeh with being a removable alien. He did not dispute his removability but submitted an application for asylum and sought withholding of removal and relief under the Convention Against Torture ("CAT"). Prior to a merits hearing on his application, Chehazeh was transferred back to FBI custody on a material witness warrant. Although the timing is unclear, it appears that Chehazeh bounced between INS and FBI custody from November 2001 until the date of the eventual hearing on his asylum application on May 24, 2002.[3]

During that hearing, the Immigration Judge ("IJ") granted Chehazeh's application for asylum pursuant to 8 U.S.C. § 1158, withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A), and withholding of removal pursuant to the CAT. In so doing, the IJ first found that, although Chehazeh's application for asylum had not been filed within a year of his entering the country as required by § 1158(a)(2)(B), his application was still timely because it was motivated by "events that ha[d] happened to [him] since the time that [he was] arrested," namely, that he had

---

[3] It is also not clear when Chehazeh was released from custody. He states that he was released sometime after August 2002, whereas the INS, in its June 18, 2002 Notice of Appeal, reported that he was not detained as of that date.

6

"developed a new fear … after people realized that [he was] giving information to the FBI."[4] (App. at 47-48.)

Next, the IJ found Chehazeh to be credible and "an exceptional, honest person," explaining that he had been "arrested only because [he] asked the FBI to please accept information that [he] felt that [he] had that related to terrorists who destroyed the World Trade Center." (App. at 48.) The IJ also noted that "the FBI ha[d] carefully examined [his] case and [he was deemed] no longer to be of special interest … . That mean[t] that what [he'd] said all along [was] true and that [he was] not a danger to the United States and that [he was] not involved in any kind of terrorist activities." (App. at 49.)

The IJ then concluded that Chehazeh was a member of a social group comprising hopeless debtors who, the IJ determined, faced a denial of fundamental rights, including the lack of a fair trial and severe prison conditions in Syria. The IJ found that, due to Chehazeh's membership in that group, there was a "clear likelihood of persecution in Syria should [he] be returned there" and that "[t]he physical abuse that would be lodged against [him] is specifically described by the State Department as torture." (App. at 60-61.) As a result, the IJ granted his applications for asylum and for withholding of removal.

---

[4] Although the IJ does not cite it, she may have been relying on § 1158(a)(2)(D), which allows an application to be considered beyond the one-year period if there are "extraordinary circumstances relating to the delay in filing an application."

The INS appealed to the BIA, claiming that the IJ erred by considering Chehazeh's asylum application to be timely, by finding that he was a member of a social group comprising hopeless debtors, and by finding that he would be unable to obtain a fair trial in Syria. The INS also claimed that the IJ "should have recused herself due to her inability to be fair and impartial." (App. at 311.) With respect to the IJ's alleged bias, the INS stated:

> [The IJ's] behavior in this matter … included but is not limited to ordering the Service … to personally travel to Respondent's place of detention to assist him in preparing his I-589 [application for asylum and withholding of removal]. When the Service declined, the [I]mmigration Judge advised that she would assume Respondent had a meritorious claim and grant him asylum. Ultimately, the Immigration Judge personally reviewed and completed Respondent's I-589. At the time of the individual hearing prior to obtaining any testimony from Respondent, the Immigration Judge advised that she was ready to render a decision.

(*Id.*)

Despite filing an appeal, the INS never submitted any briefing and, consequently, the BIA dismissed the appeal on August 20, 2004. The IJ's order thus became the final outcome of the agency proceedings, or so it appeared.

8

### 2. The Reopening of Chehazeh's Removal Proceedings

Nearly three years later, on August 9, 2007, the Bureau of Immigration and Customs Enforcement ("ICE"), which had succeeded to the responsibilities of the INS,[5] moved to reopen Chehazeh's removal proceedings and to terminate his asylum. ICE said that the proceedings should be reopened for two reasons. First, it alleged that "there [was] a showing of fraud in [Chehazeh's] application." (App. at 115.) Specifically, ICE stated that Chehazeh's claim to be wanted by police in Syria was shown to be fraudulent by a later check with Interpol revealing that he was not wanted by any authority. Second, ICE asserted that "there [were] reasonable grounds for regarding [Chehazeh] as a danger to the security of the United States," due to his interactions with Hanjour and al-Hazmi and due to his having obtained a fraudulent driver's license. (App. at 116-17.) ICE also reported that "the FBI is unable to rule out the possibility that [Chehazeh] poses a threat to the security of the United States." (App. at 117.) ICE thus argued that the proceedings should be reopened and Chehazeh's asylum terminated.

In response, Chehazeh argued that ICE's motion should be denied both because it was not based on any new evidence and because it was wrong on its merits. Regarding the purported fraud, Chehazeh pointed out that the report from Interpol was from 2003, prior to the dismissal of the

---

[5] *See Biskupski v. Att'y Gen.*, 503 F.3d 274, 276 n.1 (3d Cir. 2007) ("On March 1, 2003, Congress transferred the INS's functions to the Bureau of Immigration and Customs Enforcement … ." (citing 6 U.S.C. §§ 251, 271 & 291)).

INS's earlier appeal, and, therefore, it was not new. He also said that his statement that his family told him the Syrian authorities were looking for him was not shown to be fraudulent simply because an Interpol search showed no warrants.[6] Regarding his alleged threat to national security, Chehazeh noted that ICE "merely restate[d] the very facts known by law enforcement in 2001 and considered by the IJ," after which the IJ had concluded that Chehazeh was "not a danger to the United States." (App. at 108.) Chehazeh argued that "[i]t is both unfair and unnecessary to reopen [his] case, which was finally determined by this Board over three years ago, based on facts that have been known and available since 2001." (*Id.*)

On December 13, 2007, without explicitly ruling on ICE's motion to reopen, the BIA "exercise[d] [its] *sua sponte* authority to reopen proceedings," pursuant to 8 C.F.R. § 1003.2(a). (App. at 112.) The BIA explained that, because "the FBI has been unable to rule out the possibility that [Chehazeh] poses a threat to the national security of the United States. … reopening and remand of proceedings is warranted under these circumstances." (*Id.*) The BIA added – though not, it seemed, as a reason for reopening but as an instruction for further proceedings – that the remand should be "for a new hearing before a different Immigration Judge," because of "instances in the record" that suggested "that the Immigration Judge was not conducting the hearings in a

---

[6] Chehazeh's brief addressed a number of other purported "frauds" that were not discussed in the ICE motion but that were mentioned in an affidavit attached to that motion.

10

generally fair manner."[7] (App. at 113.) Chehazeh moved for reconsideration of that decision, questioning why the BIA "was invoking its *sua sponte* authority," despite there being no "new, material and previously undiscoverable evidence." (App. at 148.) In denying that motion, the BIA made its concern about bias a reason for reopening, saying in a footnote that, "in addition to the unique national security issues," it was exercising its *sua sponte* authority because it "was concerned that the Immigration Judge failed to adhere to the role of impartiality assigned to her as one acting in a judicial or quasi-judicial capacity." (App. at 152 n.1.)

### 3. *Chehazeh's Petition to the District Court*

On November 6, 2009, Chehazeh filed in the District Court his "Petition for Writ of Habeas Corpus and Stay of Removal Proceedings," listing the Attorney General and the Secretary of Homeland Security as respondents. Chehazeh asked the Court to issue an immediate stay of the removal proceedings, to declare that the BIA's decision to reopen the proceedings was contrary to law, and to remand with orders for the BIA to reinstate his grant of asylum and to terminate the removal proceedings. He noted that the action arose under the APA and asserted that the District Court could exercise jurisdiction through a writ of habeas corpus pursuant to 28 U.S.C. § 2241,[8] a writ of mandamus pursuant to 28

---

[7] Because the initial decision was sent to a wrong address and Chehazeh did not receive notice of it, the BIA reissued its decision on October 21, 2008.

[8] Although Chehazeh was not actually in custody, he asserted that the District Court could still exercise habeas jurisdiction because he was "subject to removal proceedings

11

U.S.C. § 1361, a declaratory judgment pursuant to 28 U.S.C. § 2201, or general federal question jurisdiction pursuant to 28 U.S.C. § 1331.

The government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction. In particular, the government argued that the Court lacked habeas jurisdiction because Chehazeh was not in "custody" for purposes of habeas corpus, even though he was subject to removal proceedings. The government also argued that the case should be dismissed for several other reasons: because the District Court was deprived of jurisdiction by the REAL ID Act of 2005, Pub L. No. 109-13, 119 Stat. 231 (2005);[9] because Chehazeh had not exhausted his administrative remedies; because the BIA's *sua sponte* decision to reopen was unreviewable; and because Chehazeh had not shown the extraordinary circumstances necessary for a writ of mandamus or that his case was ripe for a declaratory judgment.

On May 24, 2010, the District Court granted the motion to dismiss, holding that Chehazeh was not in custody and therefore there was no basis for habeas jurisdiction. The

against him, which constitute 'significant restraints on liberty … not shared by the public generally, along with some type of continuing governmental supervision.'" (App. at 13 (quoting *Obado v. New Jersey*, 328 F.3d 716, 717 (3d Cir. 2003)) (omission in original).)

[9] Specifically, the government argued that 8 U.S.C. §§ 1252(b)(9) and 1252(g), as amended by the REAL ID Act, precluded review of Chehazeh's claims.

District Court did not address any of the alternative bases for jurisdiction identified in Chehazeh's petition. On July 2, 2010, Chehazeh filed a timely Notice of Appeal to our Court.[10]

## II.    Jurisdiction And Standard Of Review

We have jurisdiction to review the District Court's decision pursuant to 28 U.S.C. § 1291. Whether the District Court had jurisdiction is the only issue on appeal and is discussed below.

We exercise plenary review over an order dismissing a complaint for lack of subject-matter jurisdiction. *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006).

## III.    Discussion

On appeal, Chehazeh argues that the District Court erred by concluding that he was not in custody for purposes of habeas review, and that, even if that were correct, the Court could have exercised jurisdiction through a writ of mandamus or a declaratory judgment and erred by failing to address those alternative avenues for relief. Chehazeh also argues that the District Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the APA. The government responds that Chehazeh was not in custody and that, even if some other avenue for review (such as the APA) might otherwise be available, review is precluded by the REAL ID Act. The

---

[10] Chehazeh's removal proceedings are stayed pending the outcome of this appeal, pursuant to an order we entered on December 3, 2010.

13

government further contends that Chehazeh has not exhausted his administrative remedies and that the BIA's exercise of its *sua sponte* reopening authority is unreviewable.

We are persuaded that the District Court has jurisdiction under § 1331 and may, under the APA, review Chehazeh's petition.[11] We will therefore reverse and remand.

---

[11] We and other courts of appeals have sometimes spoken in terms of "jurisdiction" when addressing judicial power to consider petitions for review of BIA decisions pursuant to the APA. *See, e.g.*, *Calle-Vujiles v. Ashcroft*, 320 F.3d 472, 475 (3d. Cir. 2003) (dismissing a petition for review for "lack of appellate jurisdiction" after determining that the "BIA retains unfettered discretion to decline to *sua sponte* reopen or reconsider a deportation proceeding"); *Hernandez v. Holder*, 606 F.3d 900, 904 (8th Cir. 2010) (holding that the court "lack[ed] jurisdiction" over the BIA's decision to deny administrative closure because there was no meaningful standard against which to judge the BIA's decision); *Ekimian v. I.N.S.*, 303 F.3d 1153, 1154 (9th Cir. 2002) (holding that the court "lack[ed] jurisdiction to review a BIA decision not to reopen the [removal] proceeding *sua sponte*" because it could not "discover a sufficiently meaningful standard against which to judge the BIA's decision" (emphasis removed)); *Luis v. INS*, 196 F.3d 36, 40 (1st Cir. 1999) (holding that the court had "no jurisdiction" to review the decision of the BIA not to reopen removal proceedings *sua sponte* because "the decision of the BIA whether to invoke its *sua sponte* authority is committed to its unfettered discretion."). That may be viewed, however, as too loose a use of that term. The Supreme Court has said that "the APA does not afford an implied grant of subject-matter

14

jurisdiction permitting federal judicial review of agency action." *Califano v. Sanders*, 430 U.S. 99 (1977)). Rather, the "federal question" statute, 28 U.S.C. § 1331, "confer[s] jurisdiction on federal courts to review agency action." *Califano*, 430 U.S. at 105; *see Chrysler Corp. v. Brown*, 441 U.S. 281, 317 n. 47 (1979) ("Jurisdiction to review agency action under the APA is found in 28 U.S.C. § 1331."). "The judicial review provisions of the APA," on the other hand, "provide a limited cause of action for parties adversely affected by agency action." *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) (internal quotation marks omitted). Thus, if "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), or the action is not "final agency action," 5 U.S.C. § 704, "a plaintiff who challenges such an action cannot state a claim under the APA," *Oryszak*, 576 F.3d at 525, and the action must be dismissed. *See also Trudeau v. FTC*, 456 F.3d 178, 184-85 (D.C. Cir. 2006) (holding that the provision of the APA limiting judicial review to "final agency action," does not determine whether a federal court has jurisdiction but whether a plaintiff has a cause of action). Accordingly, the Seventh and Eighth circuits have recently held that whether a court has the authority to review a decision of the BIA under the APA is not a jurisdictional question. *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) (holding that the "issue [of whether the court could review the BIA's decision to grant administrative closure] is not termed properly one of jurisdiction … [it] is not a question of whether this court has the authority to review, but rather whether the lack of any 'judicially manageable' standard, *Heckler*, 470 U.S. at 830, makes any review within [the court's] power, as a practical matter, impossible."); *Ochoa v. Holder*, 604 F.3d 546, 549

15

## A. The District Court's Jurisdiction Pursuant to 28 U.S.C. § 1331 and the Limitations of the APA

The Supreme Court has held that 28 U.S.C. § 1331 "confer[s] jurisdiction on federal courts to review agency action," "subject only to preclusion-of-review statutes created or retained by Congress." *Califano v. Sanders*, 430 U.S. 99, 105 (1977). The scope and limitations on that review are defined by the APA, which permits judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," 5 U.S.C. § 702, so long as the "agency action is [not] committed to agency discretion by law," 5 U.S.C. § 701(a)(2), no "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and the action is a "final agency action," 5 U.S.C. § 704. The form of review must conform with any relevant "special statutory

---

(8th Cir. 2010) ("When a plaintiff complains about an action that is committed to agency discretion by law, it does not mean that a court lacks subject matter jurisdiction over the claim. Instead, it means that there is no law to apply because the court has no meaningful standard against which to judge the agency's unfettered exercise of discretion.").
    We agree with the Seventh and Eighth circuits that even if Congress has committed discretion to the BIA by law to take or not take certain actions, it has not deprived the District Court or us of jurisdiction to consider a plaintiff's claim that such action was erroneous pursuant to the APA. The question is whether a plaintiff can state a claim for relief from such action under the APA. *See Trudeau*, 456 F.3d at 185 (the APA provides "a limited cause of action for parties adversely affected by agency action").

16

review" provision in the statutes governing the agency. *Smriko v. Ashcroft*, 387 F.3d 279, 290-91 (3d Cir. 2004) (citing 5 U.S.C. § 703). "[I]n the absence or inadequacy" of any "special statutory review" provision, review may take "any applicable form of legal action." 5 U.S.C. § 703.

We have previously explained that the APA standards for determining the reviewability of agency decisions are applicable to decision-making in the immigration sphere. *See Smriko*, 387 F.3d at 290-91 ("Decisions of the BIA are agency actions within the meaning of the APA," and, therefore, "we have jurisdiction to review [a BIA decision] so long as the INA does not preclude that judicial review and the issues so presented are not committed to agency discretion."); *M.B. v. Quarantillo*, 301 F.3d 109 (3d Cir. 2002) (holding that the APA enabled a district court to review the Attorney General's decision regarding an application for special immigration juvenile status because the INA did not preclude review of that decision and the decision was not committed to agency discretion). On general principles, then, the District Court had jurisdiction over Chehazeh's claims under § 1331 and could have reviewed the BIA's decision to reopen Chehazeh's removal proceedings pursuant to the APA if (1) the BIA's action was not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); (2) no statute precluded review, 5 U.S.C. § 701(a)(1); (3) the BIA's action was a "final agency action," 5 U.S.C. § 704; and (4) no "special statutory review" provision required that Chehazeh's action be brought in some other form or forum, 5 U.S.C. § 703. We consider each of those requirements below.

17

*1.    The BIA's Decision to* Sua Sponte *Reopen Removal Proceedings is Not Committed to Agency Discretion By Law*

The government, relying on *Calle-Vujiles v. Ashcroft*, 320 F.3d 472, 475 (3d Cir. 2003), and related cases, argues that the BIA has "unfettered discretion" (Letter Brief of Appellee at 5 (July 15, 2011)) regarding whether to reopen removal proceedings and, therefore, a BIA decision to *sua sponte* reopen proceedings is committed to agency discretion by law.   Those precedents, however, were based on BIA decisions declining to *sua sponte* reopen removal proceedings.   *See Calle-Vujiles*, 320 F.3d at 475 ("[T]his court is without jurisdiction to review a [BIA] decision *declining* to exercise [*sua sponte*] discretion to reopen or reconsider [a] case." (emphasis added)); *Alzaarir v. Att'y Gen.*, 639 F.3d 86, 89 n.2 (3d Cir. 2011) ("[T]he BIA's decision *not to reopen* the proceedings *sua sponte*. … is a discretionary decision beyond our jurisdiction." (emphasis added)).   We have never decided whether a BIA decision to reopen, as opposed to declining to reopen, is committed to agency discretion.[12]   The government acknowledges that no

---

[12] The government cites to a not precedential opinion to support its position.   Not precedential opinions are, by definition, not binding on this Court, and our internal operating procedures do not allow us to cite and rely upon those opinions.   *See* Internal Operating Procedures 5.7 (3d Cir. 2010).

The government also notes our statement from *Pllumi v. Attorney General* that whether to *sua sponte* reopen is "committed to the unfettered discretion of the BIA, [and] we lack jurisdiction to review a decision on whether and how to

precedential opinion – in this Circuit or any other – has decided whether decisions to reopen are unreviewable, but it argues that there is "no principled basis" for distinguishing "denials of reopening … from grants of reopening." (Letter Brief of Appellee at 2 (July 22, 2011).) We disagree. The distinction between acting and not acting is not merely a matter of semantics, and persuasive reasons for making such a distinction can be found in precedent from the BIA, this Court, and the Supreme Court.

The BIA's authority to *sua sponte* reopen removal proceedings comes from 8 C.F.R. § 1003.2(a), which states that "[t]he Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision." The regulation provides no guidance on how that authority should be exercised, but the BIA has explained that it is not boundless:

> [T]he Board retains *limited* discretionary powers under the regulations to reopen or reconsider cases on our own motion. That power, however, allows the Board to reopen proceedings sua sponte in exceptional situations not present here. The power to reopen on our

exercise that discretion." 642 F.3d 155, 159 (3d Cir. 2011). *Pllumi*, however, involved a BIA decision refusing to *sua sponte* reopen. *Id.* at 158. Any suggestion that, for reviewability purposes, grants of reopening are the same as refusals, could not be more than dicta, uttered without the benefit of the arguments that the parties have provided here, which have illuminated the meaningful distinction between the two.

> own motion is not meant to be used as a general cure for filing defects or to otherwise circumvent regulations, where enforcing them might result in hardship.

*In re J-J-*, 21 I. &. N. Dec. 976, 984 (BIA 1997) (emphasis added) (internal citation omitted). It is apparent, therefore, that the BIA views its authority to reopen as being limited and only available in "exceptional situations," *id.*, not as being "unfettered," despite the government's current claim to the contrary. The BIA has consistently relied on that "exceptional situations" limitation, applying it more than fifty times in the year leading up to its decision to reopen Chehazeh's case, *see e.g., In re Juan Marquez*, 2007 WL 4699844 (BIA Nov. 1, 2007) ("Insofar as the motion requests sua sponte reopening, we find that the motion does not establish an exceptional situation warranting the exercise of our discretionary authority."); *In re Ekins A. Hoyte*, 2007 WL 2463961 (BIA Aug. 2, 2007) ("[W]e find the pending motion sufficiently compelling to provide an exceptional circumstance warranting a reopening of [respondent's] record."); *In re Guillermo Lenin Garcia Montenegro*, 2007 WL 1153926 (BIA Mar. 12, 2007) ("[W]e find that an exceptional situation exists herein to warrant sua sponte reopening of proceedings in the exercise of discretion."), and more than one-hundred times in the past year, *see, e.g., In re Werner Remberto Orozco-Lopez*, 2011 WL 2261236 (BIA May 25, 2011) ("We further will not reopen these proceedings sua sponte because the respondent has not established an exceptional situation to do so."); *In re Elvi Antonio Vicente Arias*, 2010 WL 5173971 (BIA Nov. 30, 2010) ("The respondent presents an exceptional situation which warrants sua sponte reopening."); *In re Jose Santos*

20

*Diaz*, 2010 WL 4971010 (BIA Nov. 23, 2010) ("The respondent does not present an exceptional situation which warrants reopening on our own motion.").[13]

We have explained that "if an agency 'announces and follows – by rule or settled course of adjudication – a general policy by which its exercise of discretion will be governed,'" the exercise of that discretion may be reviewed for abuse. *Quarantillo*, 301 F.3d at 112-13 (quoting *INS v. Yang*, 519 U.S. 26, 32 (1996)). Thus, because the BIA has announced and followed a general policy that it will exercise its discretion to reopen only in exceptional situations, we may review a decision to reopen to determine whether it was based upon an exceptional situation.

That conclusion is supported by our reasoning in *Calle-Vujiles*, the case in which we ruled that "decisions not to *sua sponte* reopen or reconsider are non-reviewable." 320 F.3d at 473-75. There, relying on the Supreme Court's opinion in *Heckler v. Chaney*, we explained that courts may not review matters "where the governing 'statute is drawn so that a court would have no meaningful standard of review against which to judge the agency's exercise of discretion.'" *Id.* at 474 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). Applying that principle, we explained that, while the BIA is "*allow[ed]* … to reopen proceedings in exceptional situations," it is not "*require[d]* … to reopen proceedings in exceptional situations." *Id.* at 475. Therefore, because the BIA has "unfettered discretion to decline to *sua sponte*

---

[13] In those decisions, the BIA uses the terms "exceptional situations" and "exceptional circumstances" interchangeably.

reopen," even when there is an exceptional situation, the "exceptional situations" requirement provides no meaningful standard against which to judge a BIA's decision not to reopen. *Id.*

The same is not true, though, when the BIA chooses to exercise its authority to reopen. According to the BIA's own "settled course of adjudication," *Quarantillo*, 301 F.3d at 112, the authority to *sua sponte* reopen can be exercised only in exceptional situations, and, therefore, the "exceptional situations" requirement does provide a meaningful standard by which to judge the agency's action. The legal difference attached to the distinction between denials of reopening and grants of reopening is supported – if not mandated – by *Heckler*:

> [W]e note that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.

470 U.S. at 832 (emphasis in original). *Heckler*'s guidance is of particular import here. When the BIA refuses to reopen proceedings, it puts an end to the administrative process without the exercise of any additional "coercive power over an individual's liberty or property rights." *Id.* By contrast,

when the BIA reopens proceedings, the administrative process starts again, potentially placing in jeopardy an adjudicated right to stay in this country.

Moreover, if, as the government insists, the BIA has unfettered power to reopen, nothing would prevent it from reopening and remanding a case to a new immigration judge over and over again until satisfied with the outcome. Neither in its briefs nor at oral argument has the government offered any suggestion of what would prevent such injustice, other than its assurances that we can trust the BIA not to abuse its power. Trust is a fine thing, and the public servants who work to enforce our immigration laws – often with little of the appreciation they are due – are, no doubt, generally well worthy of trust. But our nation's Founders were wise enough to know that "trust us" is a poor operating principle for government. Hence they gave us the check of judicial review, which is particularly appropriate here because, unlike a refusal to reopen, a BIA decision granting reopening has implications for substantive liberty rights and for due process rights – both of which are "areas that courts often are called upon to protect." *Id.* Just as *Heckler* was the basis for our holding in *Calle-Vujiles* that the BIA's refusal to reopen *sua sponte* is unreviewable, *Heckler* also counsels against extending that rule to situations where the BIA does exercise its *sua sponte* authority. The import of *Heckler* is that because a BIA decision to reopen proceedings "itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner," that action "at least can be reviewed to determine whether the agency exceeded its" settled course of reopening only in exceptional situations. *Id.*

23

Our decision in *Cruz v. Attorney General*, 452 F.3d 240 (3d Cir. 2006), lends further support to our conclusion on this point. In that case, we remanded a petition to the BIA because we could not "tell from its opinion whether the BIA concluded that Cruz made out a prima facie case for *sua sponte* relief … but nevertheless exercised its unreviewable discretion … to decline to reopen, or whether it believed that Cruz had not shown an 'exceptional situation,' and was therefore ineligible … for *sua sponte* relief." *Id.* at 250. We explained that if it was the latter, "we would have jurisdiction to review the BIA's decision," *id.*, which strongly suggests that courts have jurisdiction to review the threshold question of whether there was an exceptional situation.

We are thus persuaded that there are indeed principled reasons for distinguishing between the reviewability of a BIA decision denying reopening and the reviewability of a BIA decision granting reopening. In sum, because the BIA has limited its reopening authority only to exceptional situations, when it exercises that authority, there is a basis for judicial review to determine whether the agency decision was based upon an exceptional situation.[14]

---

[14] We recognize that it may not always be obvious whether a situation is exceptional. That, however, is no impediment to judicial review. The "exceptional situations" requirement is, in that regard, similar to the requirement discussed in *Smriko* that a decision be streamlined only where the "issues raised upon appeal are not so substantial that the case warrants the issuance of a written opinion." 387 F.3d at 293. As we explained there, "[t]he fact that [the requirement] may require the exercise of some discretion on the part of the [BIA] that may be deserving of some deference is, of course,

The government argues that, to the extent the District Court might otherwise have jurisdiction, amendments to the immigration laws promulgated by the REAL ID Act preclude judicial review. Specifically, the government cites 8 U.S.C. § 1252(b)(9) and 8 U.S.C. § 1252(g).

### (a)    *8 U.S.C. § 1252(b)(9)*

Section 1252(b)(9) states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this

not relevant; the APA expressly authorizes review of the exercise of discretion for abuse." *Id.* Determining whether a situation is exceptional is no more difficult than determining whether factual and legal issues are substantial, and "it will be the rare case, indeed, where the reviewing court, having received the administrative record and the briefs of the parties, will have any difficulty, without more, reaching a decision as to whether the [BIA] was so wide of the mark in applying [the 'exceptional situations' requirement] that [its] action can be characterized as arbitrary and capricious." *Id.* at 293-94.

section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Based on that provision, the government argues that "judicial review of a final order" is the only avenue to review any issue arising from a "proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(9). There is obvious force to that reasoning, given the quoted text, but the Supreme Court has noted that § 1252(b)(9) is subject to the limitations of § 1252(b), and, therefore, "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (quoting 8 U.S.C. § 1252(b)).[15] Section 1252(b)(9), "by its own terms," does

---

[15] Section 1252(b) states: "With respect to review of an order of removal under subsection (a)(1) of this section, the following requirements apply …". Because § 1252(b) only applies "[w]ith respect to review of an order of removal under subsection (a)(1)," which, in turn, provides for "[j]udicial review of a final order of removal," the provisions in § 1252(b) only apply when, unlike this case, there is a final order of removal issued. Our dissenting colleague nevertheless reads 8 U.S.C. § 1252(b)(6) to manifest a clear congressional intention to require aliens to secure a final order of removal before seeking any type of judicial review of any type of order in any type of forum. (Dissenting Op. at 4; *see id.* (citing § 1252(b)(6) and arguing that we should not "circumvent Congress's clear intention to allow aliens only

26

not bar review of an order "not subject to judicial review under § 1252(a)(1)," *St. Cyr*, 533 U.S. at 313, and § 1252(a)(1) describes only "review of a final order of removal." *See* 8 U.S.C. § 1252(a)(1) ("Judicial review of a final order of removal … is governed only by chapter 158 of title 28, except as provided in subjection (b) of this section … ."). Section 1252(b)(9), therefore, requires only that, when there is an order of removal under subsection (a)(1), review of any issues related to that order must be consolidated into a single petition for review and cannot be brought piecemeal. One may not, for instance, follow a petition for review with a habeas petition or a petition for a writ of mandamus.[16]

---

one opportunity to seek review of a motion to reopen as part of the review of the order of removal before a court of appeals … .").) Section 1252(b)(6) provides: "When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order." Read in conjunction with subsection (a)(1), the only thing § 1252(b)(6) clearly does is require a motion to reopen or reconsider to be consolidated before us on an appeal when there is a final order of removal. There is no such order here.

[16] Thus, in *Bonhometre v. Gonzales*, we stated that § 1252(b)(9), as amended by the REAL ID Act, "effectively limit[s] all aliens to one bite of the apple *with regard to challenging an order of removal*, in an effort to streamline what Congress saw as uncertain and *piecemeal review of orders of removal*, divided between the district courts (habeas corpus) and the courts of appeals (petitions for review)." 414 F.3d 442, 446 (3d Cir. 2005) (emphasis added). *Bonhometre* reinforces the view that § 1252(b)(9) is aimed at

27

Although *St. Cyr* issued prior to the REAL ID Act, the REAL ID Act did not modify § 1252(b) or the instruction that § 1252(b)(9) "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *St. Cyr*, 533 U.S. at 313 (quoting 8 U.S.C. § 1252(b)). Since that time, both the Ninth and Eleventh Circuits have held that, when a person is not seeking review of "an order of removal under subsection (a)(1)," the limitations of § 1252(b)(9) do not apply. *See Singh v. Gonzalez,* 499 F.3d 969, 978 (9th Cir. 2007) ("By virtue of [its] explicit language … 1252(b)(9) appl[ies] only to those claims seeking judicial review of orders of removal."); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006) (explaining that "section 1252(b)(9) applies only [w]ith respect to review of an order of removal" and that the REAL ID Act "did not expand the scope of [§ 1252(b)(9)] by making it applicable to cases other than those involving 'review of an order of removal'" (internal quotation marks omitted))); *cf.* House Conference Report on the REAL ID Act, H.R. Rep. No. 109-72, at 175, 2005 U.S.C.C.A.N. 240, 299 ("[S]ection 106 would not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders.").

While we have not written precedentially on the scope of § 1252(b)(9) after the REAL ID Act, we have addressed the effect of nearly identical language in § 1252(a)(5). In *Kumarasamy v. Attorney General,* we considered whether a habeas petition that was before us on appeal when the REAL

consolidating all challenges to an order of removal and not aimed at consolidating claims arising from administrative actions unrelated to an order of removal.

28

ID Act came into effect should be converted into a petition for review pursuant to 8 U.S.C. § 1252(a)(5). 453 F.3d 169, 172 (3d Cir. 2006). That subsection states that a "petition for review filed with an appropriate court of appeals … shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). The petitioner in *Kumarasamy* had not been seeking review of an order of removal but was seeking habeas relief, claiming that his deportation was illegal "because there was *no* order of removal." 453 F.3d at 172 (emphasis in original). We held that § 1252(a)(5) did not apply, because that provision pertained only to "judicial review *of an order of removal.*" *Id.* (emphasis in original). Our holding in *Kumarasamy* supports the conclusion that, because § 1252(b) refers only to "review of an order of removal under subsection (a)(1)," it, and its subsections, are inapplicable when there is no such order.[17]

---

[17] The government argues that *Kumarasamy* actually supports its position. Citing a footnote in *Kumarasamy* in which we explained that § 1252(b)(9) had been amended by the REAL ID Act to clarify that it "'preclude[s] any habeas corpus review over certain removal-related claims,'" the government asserts that we held that any review of an "'action taken or a proceeding brought to remove [an alien]'" is limited by § 1252(b)(9) to review of a final order, "even if removal proceedings have not yet commenced or no final order of removal is in place." (Letter Brief of Appellee at 1-2 (July 15, 2011) (quoting *Kumarasamy*, 453 F.3d at 172 n.5).) But even if that portion of *Kumarasamy* is read in the manner the government urges – which would place *Kumarasamy's* interpretation of § 1252(b)(9) in stark contrast with its interpretation of the nearly identical language in § 1252(a)(5)

Not all courts agree with the conclusion reached by the Ninth and Eleventh Circuits and suggested by us in *Kumarasamy*.[18] The First Circuit held in *Aguilar v. United States Immigration & Customs Enforcement* that "the reach of section 1252(b)(9) is not limited to challenges to singular orders of removal." 510 F.3d 1, 9 (1st Cir. 2007).[19] The

---

– *Kumarasamy* expressly restricts that statement to dicta, explaining that we did not need to "reach the question of whether §[] 1252(b)(9)" applied because "the District Court lacked jurisdiction on [a] separate ground." 453 F.3d at 172 n.5.

[18] In addition to the Ninth and Eleventh Circuits, the Tenth Circuit, in dicta, has also stated that 1252(b)(9) applies only to review of orders of removal. *See Ochieng v. Mukasey*, 520 F.3d 1110, 1115 (10th Cir. 2008) ("It appears that subsequently-enacted provisions of the REAL ID Act limiting habeas relief, codified at 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9), do not apply in these circumstances, as Mr. Ochieng would not be seeking review of an order of removal, but review of his detention.") The Eighth Circuit appears to acknowledge at least the possibility that § 1252(b)(9) might not apply when there is no final order of removal. *See Skurtu v. Mukasey*, 552 F.3d 651, 657-58 (8th Cir. 2008) (acknowledging the Ninth Circuit's conclusion that §1252(b)(9) "by [its] plain language, appl[ies] to only those claims seeking judicial review of orders of removal," but concluding that the *Skurtu* petitioner was, in fact, "seek[ing] review of the IJ's removal order").

[19] Although *Aguilar* draws a different conclusion than we do on the question of the scope of § 1252(b)(9), the

reasoning of *Aguilar*, however, appears to conflict with the Supreme Court's explicit instruction in *St. Cyr*, 533 U.S. at 313 ("[Section 1252(b)(9)] applies only '[w]ith respect to review of an order of removal under subsection (a)(1)."), and with the language of § 1252(b) ("With respect to review of an order of removal under subsection (a)(1) of this section, the following requirements apply … ."). We therefore join with the Ninth and Eleventh Circuits and hold that § 1252(b)(9) applies only "[w]ith respect to review of an order of removal under subsection (a)(1)." 8 U.S.C. § 1252(b). Because Chehazeh is not seeking review of any order of removal – as there has been no such order with respect to him –

_____

reasoning of *Aguilar* may still allow review of Chehazeh's claim. There, the First Circuit explained that, while § 1252(b)(9) is not limited to review of orders of removal, it would be "perverse" to read § 1252(b)(9) as encompassing claims that, "by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA." 510 F.3d at 11. Congress, it said, "inten[ded] to channel, rather than bar, judicial review through the mechanism of section 1252(b)(9)" and to read § 1252(b)(9) as encompassing claims "that cannot effectively be handled through the available administrative process" would be inconsistent with the presumption "that there be clear and convincing evidence of legislative intent before restricting access to judicial review entirely." *Id.* As discussed at length *infra* Part III(A)(3)(b), Chehazeh's claim could not be "raised efficaciously" if it could be brought only after a final order of removal. Thus, even under the First Circuit's reasoning in *Aguilar*, § 1252(b)(9) would, it seems, not bar review of Chehazeh's claim.

31

§ 1252(b)(9) does not preclude judicial review.

*(b)     8 U.S.C. § 1252(g)*

Section 1252(g), titled "Exclusive jurisdiction," states:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

The government argues that Chehazeh's claim arises from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders, and, therefore, review of that claim before there has been a final order is precluded under § 1252(g). If the government's position is accepted, then § 1252(g) would preclude judicial review of any action related to removal proceedings, other than a final removal order, as any such claim could be said to "aris[e] from the decision or action by the Attorney General to commence proceedings." *Id.* We cannot accept that position. If § 1252(g) precludes review of any action related to removal proceedings with the sole exception of a final order of removal, then, by insulating BIA decisions to *sua sponte* reopen proceedings, § 1252(g) effectively becomes a "do-over" provision, allowing the BIA

to repeatedly remand proceedings to a new IJ until the government likes the outcome. As already discussed, *supra* Part III(A)(1), such a result would give rise to serious due process concerns.

Fortunately, the Supreme Court has explained that § 1252(g) has a more limited scope than the government claims for it. In *Reno v. American-Arab Anti-Discrimination Committee*, the Court said that § 1252(g) was designed to address only three discrete actions by the Attorney General: the "decision or action to commence proceedings, adjudicate cases, or execute removal orders." 525 U.S. 471, 482 (1999) (internal quotation marks omitted). It is not "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review,'" as "it is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." *Id.* Instead, § 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 485 n.9.

We recognize that BIA decisions may be construed as actions of the Attorney General, *see, e.g.*, 8 C.F.R. § 1003.1(a)(1) (explaining that the members of the BIA are "appointed by the Attorney General to act as the Attorney General's delegates"), and, therefore, that BIA actions may in some cases implicate § 1252(g). This is not one of those cases, however, because the decision to *sua sponte* reopen proceedings is not a prosecutorial decision to "commence proceedings, adjudicate cases, or execute removal orders." *Reno*, 525 U.S. at 482. Rather, it is a quasi-judicial decision to reconsider an already adjudicated case.

An argument might be made that a decision to reopen is similar enough in character to a decision to adjudicate a case in the first instance that any reopening should be encompassed within § 1252(g), but we think that position is untenable for two reasons.  First, and most importantly, in listing the kinds of "decisions or actions that may be part of the deportation process" but are not encompassed by § 1252(g), the Supreme Court included the decision "to refuse reconsideration of [a removal order]."  *Id.*  Thus, the Supreme Court distinguished between the initial adjudication of a case and the reconsideration of that case, declaring that the latter was not encompassed within § 1252(g).[20]  Second, as the Supreme Court noted, § 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  *Id.* at 485 n.9.  Using the template of prosecutorial discretion, one can see that the decision to adjudicate a case in the first instance – to indict a criminal and bring him to trial – is considered an act of unreviewable discretion, but the traditional ambit of that discretion does not

---

[20] We recognize, of course, that refusing to reconsider is not the same as reconsidering.  We have already opined that there is a material difference between an agency doing something and refusing to do something.  Here, however, that difference only reinforces our point because, as explained in *Heckler*, when an agency refuses to take action, it is generally afforded a greater degree of deference than when it actually takes action.  470 U.S. at 832.  Thus, when, as in this instance, even the refusal to reconsider a case is not encompassed within § 1252(g)'s protection of prosecutorial discretion, the act of reconsidering a case – which is afforded less deference – should not be either.

include a right for prosecutors to order the relitigation of any case they lose. When the BIA decides to reopen a case, it is acting in a quasi-judicial role, similar to a judge granting a new trial. It is not in a prosecutorial role.

According to the Supreme Court's analytical construct, § 1252(g) was designed to make unreviewable prosecutorial decisions, not quasi-judicial ones. We therefore conclude that, when the BIA reopens removal proceedings, its action does not constitute a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders," and, thus, claims arising from that action do not fall within the scope of § 1252(g). Because § 1252(g) and § 1252(b)(9) – the only potential statutory barriers identified by the government – do not preclude review, there is apparently no statute that precludes judicial review of the BIA's decision to reopen Chehazeh's removal proceedings.[21]

---

[21] Nor does 8 U.S.C. § 1252(a)(2)(B)(ii) apply here. In *Kucana v. Holder*, the Supreme Court held that 8 U.S.C. § 1252(a)(2)(B)(ii) applies only to "statutory, but not to regulatory" grants of discretion. **---** U.S. **---**, 130 S. Ct. 827, 831 (2010). As the Court explained, the BIA's power to reopen asylum proceedings is specified not in a statute but in regulation: "Congress did not codify the regulation delegating to the BIA discretion to grant or deny motions to reopen. *See* 8 CFR § 1003.2(a) (reopening may be entertained not only on application; the Board 'may at any time reopen ... on its own motion any case in which it has rendered a decision')." *Id.* at 838. Indeed, it was for that reason, the Court held that "[t]he BIA has broad discretion, conferred by the Attorney General, 'to grant or deny a motion to reopen,' 8 CFR § 1003.2(a), but

> *3.* *The BIA's Decision to Reopen Chehazeh's Removal Proceedings is a Final Agency Action*
>
> *(a)* *The "Collateral Order Doctrine" Applies to Review of Administrative Decisions*

The BIA's decision to reopen Chehazeh's case was not a final disposition of the renewed administrative proceedings. Therefore, we must first consider whether agency action that does not conclude administrative proceedings may ever be considered "final agency action" for purposes of Section 704.

A provision analogous to Section 704's "final agency action" requirement is found in 28 U.S.C. § 1291, which permits appellate review only of "final decisions" of a district court. In that context, it has long been understood that, while "a 'final decision' generally is one which ends the litigation on the merits," *Catlin v. United States*, 324 U.S. 229, 233 (1945), other preliminary decisions may be "final" if they are "conclusive," "resolve important questions completely separate from the merits," and would be "effectively unreviewable on appeal from final judgment in the underlying action." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994). That understanding, known as the "collateral order doctrine," is best seen "not as an exception to the final decision rule … but as a practical construction of it, which recognizes that [w]hile a final judgment always is a final decision, there are instances in which a final decision is

courts retain jurisdiction to review, with due respect, the Board's decision." *Id.* at 838.

not a final judgment." *Harris v. Kellogg Brown & Root Servs. Inc.*, 618 F.3d 398, 400 (3d Cir. 2010) (internal quotation marks and citations omitted).

While we have never considered whether the collateral order doctrine applies to judicial review of agency decisions, the nine Courts of Appeals that have addressed the question have all concluded that it does. *See Hale v. Norton*, 476 F.3d 694, 698 (9th Cir. 2007) (holding that the collateral order doctrine applies to review of administrative decisions); *Rhode Island v. EPA*, 378 F.3d 19, 24-25 (1st Cir. 2004) (holding the same and citing cases in the Second, Fourth, Fifth, Sixth, Tenth, Eleventh, and D.C. circuits also holding the same). The Supreme Court has likewise strongly suggested that the doctrine applies in the administrative context. *See Bell v. New Jersey*, 461 U.S. 773, 778 (1983) ("We conclude that, *at least in the absence of an appealable collateral order*, the federal courts may exercise jurisdiction only over a final order of the Department [of Education]." (emphasis added) (internal citations omitted)). We see no reason to depart from the unanimous view on the issue and, therefore, join in holding that the collateral order doctrine applies to judicial review of agency decisions.

### (b) The BIA's Decision is a Collateral Order

Because the BIA's decision did not conclude the administrative proceedings on the merits, it is reviewable as a collateral order only if it (1) is "conclusive," (2) "resolve[s] important questions completely separate from the merits," and (3) would be "effectively unreviewable on appeal from

37

final judgment in the underlying action." *Digital Equip.*, 511 U.S. at 867.

Chehazeh has already availed himself of the only administrative remedy available to him – asking the BIA to reconsider its decision to reopen – and, therefore, absent judicial review, Chehazeh will be forced to go through a second round of removal proceedings. In light of that fact, the government does not dispute that the BIA's decision is "conclusive," and indeed it is.

The government does argue, however, that the other two requirements for collateral review are not present here. First, it contends that the BIA's decision does not "resolve important questions completely separate from the merits," *id.*, because the BIA justified its decision to reopen by citing the FBI's inability to rule out the possibility that Chehazeh is a national security threat. That argument, though, misses the point. While the question of whether Chehazeh is a national security threat does go to the merits of whether he should continue to enjoy asylum, the BIA's decision neither resolves nor even addresses that question. Instead, the decision addresses whether the FBI's inability to rule out that possibility warranted reopening the proceedings. The question resolved by the BIA, therefore, was whether the FBI's inability to determine whether a person is a security threat gives rise to an exceptional situation justifying reopening. That question is separate from the merits of whether Chehazeh is, in fact, a security threat. Similarly, the BIA's determination that allegations of IJ partiality justified reopening pertains to a question separate from the merits of Chehazeh's asylum claim. If the District Court should later review the BIA's decision, it, likewise, will be tasked not

with determining whether Chehazeh is a national security threat but with determining whether the FBI's inability to rule out that possibility, coupled with allegations of IJ partiality, constituted exceptional situations. Both of those questions are distinct and separate from the merits of whether Chehazeh's asylum application should be granted. We therefore conclude that the BIA's decision "resolve[s] important questions completely separate from the merits." *Id.*

Second, the government contends that the BIA's decision is not "effectively unreviewable on appeal from final judgment in the underlying action." *Id.* In support of that argument, the government cites *Will v. Hallock*, in which the Supreme Court held that when a party seeks to avoid trial through collateral order review of a pre-trial order, the order is reviewable only if there are "compelling public ends." 546 U.S. 345, 351-52 (2006). The Supreme Court reasoned that "almost every pretrial or trial order might be called 'effectively unreviewable'" and allowing collateral order of all of them "would leave the final order requirement of § 1291 in tatters." *Id.* at 351. That observation is sound but inapposite here.

Chehazeh is not seeking collateral review of a pre-trial order so as to avoid litigation. He is seeking, instead, collateral review of a post-adjudication order so as to enforce the result of an adjudication that has already taken place. That there is a legally significant difference between seeking to avoid litigation in the first instance and seeking to avoid relitigating an issue that has already been decided was explicitly recognized in *Will*, and listed as a "compelling public end" that supports collateral order review. The Supreme Court explained that, in the context of a criminal

39

prosecution, while collateral order review was unavailable to avoid trial in the first instance because an individual does not have "a right to be free of all proceedings whatsoever," collateral order review was available to consider a claim of double jeopardy because "the only way to alleviate the[] consequences of the Government's superior position was by collateral order appeal." *Id.* at 352. Of course, this is not a criminal case, and the Double Jeopardy clause is not at issue. Nonetheless, the reasons why collateral order review can be invoked to avoid double jeopardy, as described in *Abney v. United States*, are instructive here:

> [T]he underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.

431 U.S. 651, 661-62 (1977) (internal quotation marks omitted).

Should the BIA be free to *sua sponte* reopen removal proceedings, without the possibility of judicial review, nothing would prevent it, "with all its resources and power" from "mak[ing] repeated attempts to [deport Chehazeh], thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety

and insecurity."[22]  *Id.*  The fact that the government, in this case, may not be constitutionally prohibited by the Double Jeopardy Clause from using its "resources and power" in a particular way does not mean that we should be unconcerned by the possible abuse of that power – particularly when, as here, that power is supposed to be used only in exceptional situations.

Indeed, in *Duvall v. Attorney General* we recognized the magnitude of the concerns raised by repeated relitigation when we noted that "[s]ubstantive due process may offer some protection against repeated relitigation of the same issue by an administrative agency."  436 F.3d 382, 387 n.5 (3d Cir. 2006).  For reasons substantially similar to the concerns explained above, in *Duvall* we interpreted the INA as incorporating principles of collateral estoppel:  "The adversarial system of dispute resolution established in the INA is plainly adjudicatory in character and susceptible to full application of common law principles of preclusion."  *Id.* at 390.  As we explained, if that were not true, "[f]ailure to satisfy the burden of proof at one hearing before one

---

[22] We have previously applied Sixth Amendment jurisprudence by analogy in the immigration context.  *See Fadiga v. Att'y Gen.*, 488 F.3d 142, 157 & n.23 (3d Cir. 2007) (borrowing from Sixth Amendment jurisprudence in an immigration case because, although "[a]s a matter of formal constitutional doctrine, the Sixth Amendment … does not apply in a civil context such as immigration proceedings[,] … we cannot treat immigration proceedings like everyday civil proceedings … because … the liberty of an individual is at stake in deportation proceedings" (internal quotation marks omitted)).

41

immigration judge would have no effect on the government's ability to bring successive proceedings in front of successive immigration judges," and "[t]he same evidence could be introduced and the same witnesses could be interrogated, over and over, until the desired result is achieved." *Id.* at 388. That conclusion comports with a lengthy line of case law in this circuit and in our sister circuits. *See, e.g.*, *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008) (holding that, as a general matter, res judicata applies to administrative hearings and works to minimize "the expense and vexation attending multiple lawsuits"); *Babcock & Wilcox Co. v. Marshall*, 610 F.2d 1128, 1138 (3d Cir. 1979) (holding that exhaustion of administrative remedies is not always required when, for example, "the administrative procedure itself is alleged to violate a constitutional right … by subjecting a party to 'vexatious and harassing' prosecutions by refusing to apply collateral estoppel"); *Cont'l Can Co., U.S.A. v. Marshall*, 603 F.2d 590, 597 (7th Cir. 1979) (holding that in the administrative adjudication context, it is "rather fundamental" and is a "basic tenet of due process" that "the Government cannot, without violating due process, needlessly require a party to undergo the burdens of litigation" because "[t]he Government is not a ringmaster for whom individuals and corporations must jump through a hoop at their own expense each time it commands" (internal quotation marks omitted)); *cf. Bartkus v. Illinois*, 359 U.S. 121, 127 (1959) (holding that "the cruelty of harassment by multiple prosecutions" can violate the Due Process clause of the Fifth Amendment).

This case is not about "mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest" – namely the public's interest in "mitigating the

government's advantage over the individual" and preventing the government from using its superior "resources and power" to re-run removal proceedings except in exceptional situations. *Will*, 546 U.S. at 352-53. Those interests are compelling because they "count when asking whether an order is 'effectively' unreviewable if review is to be left until later," *id.* at 353, because they raise concerns so substantial as to implicate the due process clause. *See Duvall*, 436 F.3d at 387 n.5. Thus, we hold that the BIA's order *sua sponte* reopening Chehazeh's removal proceedings would be effectively unreviewable on appeal from a final judgment. Because the BIA's order is also conclusive, and decides important questions separate from the merits of Chehazeh's asylum claims, it is, pursuant to the collateral order doctrine and for purposes of judicial rewiew, the functional equivalent of a final agency action.[23]

---

[23] The government also makes the further claim that the District Court lacks jurisdiction because Chehazeh has not exhausted his administrative remedies. With respect to the harm of being forced to relitigate his case, however, Chehazeh has exhausted the only administrative remedy available to him – asking the BIA to reconsider its order. This is not a case like *Duvall v. Elwood*, where the alien was "'attempting to prevent … deportation proceeding[s] from taking place in the first instance,'" and therefore, had not exhausted the remedy of the "deportation … hearing itself." 336 F.3d 228, 233 (3d Cir. 2003) (quoting *Massieu v. Reno*, 91 F.3d 416, 421 (3d Cir. 1996)) (alterations in original). As already discussed, Chehazeh has been through "deportation proceeding[s] … in the first instance," *id.*, and is seeking to enforce the result of those proceedings. Even if we were to conclude that Chehazeh had not exhausted his administrative

*4. No "Special Statutory Review" Provision Requires that the Action be Brought in Some Other Form or Forum*

"Where the governing statute provides for 'special statutory review' … that is the form that the required judicial review will take." *Smriko*, 387 F.3d at 291 (quoting 5 U.S.C. § 703). As previously noted, while a "special statutory review" provision dictates the process pertaining to final orders of removal, *see* 8 U.S.C. § 1252(b), (b)(9) ("With respect to review of an order of removal … [,][j]udicial review of all questions of law and fact … shall be available only in judicial review of a final order under this section."), there is no such provision with respect to final or effectively final BIA actions besides final orders of removal. Consequently, the proceeding may take "any applicable form of legal action … in a court of competent jurisdiction," 5 U.S.C. § 703.[24]

_____

remedies, however, there is an exception to the exhaustion requirement when the claim for which review is sought is wholly collateral to the merits of the administrative proceedings. *Massieu*, 91 F.3d at 422-23. As discussed above, Chehazeh's claim that the BIA erred in reopening his removal proceedings is collateral to the merits of those proceedings.

[24]As mentioned *supra* at note 15, our dissenting colleague believes that Congress intended a final order of removal to be a condition precedent to judicial review before a federal appellate court. (Dissenting Op. at 4; *see id.* at 13-14 n.8 ("If the established procedures are allowed to go forward as provided in the statute, … Chehazeh will be able to obtain review of the decision reopening the case upon

44

Thus, because no statute precludes review of the BIA's decision, which is effectively final and not committed to agency discretion by law, the District Court has jurisdiction to review the decision. We will therefore reverse its order dismissing for lack of jurisdiction.

### B. Whether the BIA's Decision is Justified by an "Exceptional Situation"

Because the District Court believed that it did not have jurisdiction over Chehazeh's petition, it never addressed whether the BIA's decision to reopen proceedings was warranted by an exceptional situation. We may decide a question not addressed by the District Court when "the record has been sufficiently developed for us to resolve [the] legal issue." *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 306 (3d Cir. 1999). Here, the BIA offered two justifications for its decision: that "the FBI has been unable to rule out the

_____

conclusion of the proceedings.").) Thus, he rejects our conclusion that no special statutory review provision requires that the action be brought in some other form or forum, and he points to 8 U.S.C. § 1252(a)(2)(D) as support. That statute, however, is not apposite. It provides that the provisions limiting or eliminating judicial review in the Real ID Act do not extend to constitutional or legal questions which the court of appeals may properly consider notwithstanding § 1252(a)(2)'s list of "[m]atters not subject to judicial review." It does not speak at all to the question of whether relief under the APA must be sought in a particular forum, and it certainly does not establish a rigid protocol whereby an alien must be ordered removed by the BIA before pursuing any relief in any forum.

45

possibility that the respondent poses a threat to the national security of the United States," (App. at 112) and that the BIA was "concerned that the Immigration Judge failed to adhere to the role of impartiality assigned to her as one acting in a judicial or quasi-judicial capacity." (App. at 152.) We conclude that the record is insufficient for us to determine whether either of those alleged situations are exceptional, and, therefore, we will remand to the District Court.

With respect to the BIA's first proffered reason – the FBI's inability to rule out the possibility that Chehazeh is a national security threat – a "blink" response is that it may not be exceptional. "[P]roving a negative is a challenge in any context," *Vieth v. Jubelirer*, 541 U.S. 267, 311 (2004) (Kennedy, J., concurring), and if the BIA were able to reopen any proceeding in which the FBI was "unable to rule out the possibility" that a person was a security threat, reopening may perhaps become a regular occurrence and hardly exceptional. Moreover, the facts known at the time of the initial removal proceedings led the IJ to conclude that Chehazeh was "not a danger to the United States and that [he was] not involved in any kind of terrorist activities" – a conclusion based on "the FBI ha[ving] carefully examined [his] case" and determining that he was "no longer to be of special interest." (App. at 49.) The government never pursued its appeal of that decision. Nor, in moving to reopen, has the government offered any new facts suggesting that Chehazeh was, or has become, a security threat. Allowing the BIA to reopen under these circumstances would thus appear to circumvent the general requirement that a motion to reopen "shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available … at the former hearing." 8 C.F.R. § 1003.2(c)(1).

The BIA has plainly stated that its *sua sponte* authority is not designed to "circumvent the regulations." *In re J-J-*, 21 I. & N. Dec. at 984. That authority may, of course, have the effect of circumventing the regulations when an exceptional situation calls for it, but wherever the line between an unexceptional situation and an exceptional situation lies, we wonder whether – on this record – this case is near it. Nevertheless, we cannot say whether the FBI might have heretofore-undiscussed criteria by which it can, in ordinary circumstances, effectively rule out aliens as security threats, and we certainly cannot say with assurance that there was not an exceptional reason for some change in the FBI's assessment of Chehazeh. Thus, the record is insufficient for us to decide the issue.

With respect to the concern that "the Immigration Judge failed to adhere to the role of impartiality assigned to her as one acting in a judicial or quasi-judicial capacity," (App. at 152), the BIA has not given much detail regarding the allegedly problematic conduct. Most of what we know is from the INS appeal from the initial IJ decision, in which, among other things, the INS asserted that the IJ had ordered it "to assist [Chehazeh] in preparing his [application for asylum and withholding of removal]," or else she would "assume [he] had a meritorious claim and grant him asylum," and that, "[u]ltimately, the Immigration Judge personally reviewed and completed [his application]." (App. at 311.)

If, in fact, those allegations are true, they certainly seem unusual and may warrant categorizing the circumstances as exceptional. But, again, based on the record before us, we cannot make that determination. We will

47

therefore remand to the District Court to allow the parties to supplement the record so that that Court can "review the whole record," 5 U.S.C. § 706, to determine whether there was an exceptional situation that warranted reopening Chehazeh's removal proceedings.

## IV.     Conclusion

For the foregoing reasons, we will reverse the District Court's order dismissing Chehazeh's petition for lack of jurisdiction and will remand for the District Court to consider whether the BIA's decision to reopen Chehazeh's removal proceedings was warranted by an exceptional situation.

GREENAWAY, JR., <u>Circuit Judge</u>, dissenting,

Since I conclude that Congress has established a clearly defined system for the courts to review decisions of the Board of Immigration Appeals ("BIA"), which requires that petitions for review be filed with the courts of appeals, and not the district courts, I find that I must respectfully dissent from the majority's opinion. Congress, by enacting the REAL ID Act, vested courts of appeals with jurisdiction to review orders reopening removal proceedings. 8 U.S.C. § 1252(b)(6).[1] This specific statutory authority overrides the application here of the provisions of the Administrative Procedures Act ("APA"), and undermines the majority's reasoning.

The majority sets forth the factual and procedural history of this matter in thorough detail. I have nothing to add. Similarly, the majority clearly recites the factors we must review in determining whether the APA applies. As they state, review under the APA is available

> if (1) the BIA's action was not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); (2) no statute precluded review, 5 U.S.C. § 701(a)(1); (3) the BIA's action was a "final agency action," 5 U.S.C. § 704; and (4)

---

[1] Section 1252(b)(6) provides that "[w]hen a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order."

> no "special statutory review" provision required that Chehazeh's action be brought in some other form or forum, 5 U.S.C. § 703.

Majority Dec. at 17.

While I think the majority's reasoning on factors (1)[2] and (3)[3] is open to debate, my principal point of disagreement

---

[2] While I agree with the majority's ultimate conclusion that the BIA's decision in this case is not discretionary, I would reach that decision by a different, and somewhat shorter, path. The government's motion, filed pursuant to 8 C.F.R. § 1208.24, sought to reopen the proceedings in order to terminate Chehazeh's asylum and withholding of removal. Section 1208.24(f) sets forth specific criteria that the government must establish by a preponderance of the evidence during the reopened proceeding in order to terminate the alien's asylum or withholding of removal. Arguably, the government, in its motion to reopen, would have to demonstrate a likelihood of success in proving at least one of these factors. As a result, the BIA's decision to reopen would not be discretionary. Rather, the BIA would be required to evaluate the specific factors set forth in the regulations in reaching its decision on reopening.

[3] I disagree with the majority's conclusion that the BIA's decision to reopen this case constitutes final agency action. I explain my views more fully infra.

2

focuses on factor (4).[4]  Congress has developed a statutory scheme that vests responsibility for judicial review of immigration decisions in the courts of appeals, and explicitly directs that review of BIA decisions on motions to reconsider and reopen be consolidated with the review of orders of removal.  Given Congress's efforts to remove district courts from the responsibility of reviewing immigration decisions, why should we extend that authority here?  I also believe that Congress's explicit provision of a method of review for motions to reconsider and reopen undermines the majority's APA argument.

As the majority notes, <u>Smriko v. Ashcroft</u> allows for application of the APA only "in the absence or inadequacy" of any "special statutory review" provisions.  387 F.3d 279, 290-91 (3d Cir. 2004).  In the present case, there are two statutes, given short shrift by the majority, that provide for review of immigration decisions, including motions to reopen.  First, 8 U.S.C. § 1252(a)(2)(D) provides that

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions

---

[4]  I agree with the majority's conclusion in section III.A.2.a. that no statute precludes judicial review of the BIA's decision.  That discussion, however, focuses only on the impact of the REAL ID Act on the review of habeas corpus petitions vis- à-vis review of orders of removal.  I find that analysis inapposite to the question presently before us.

of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

This provision removes the authority to review legal and constitutional claims from district courts. The APA basis for jurisdiction is only available if no "special statutory review" provision requires that the action be brought in some other forum. Here, Congress has provided a basis for review before our Court, not the district court. The statute does not prohibit judicial review, but it does limit that review to the courts of appeals.

Second, 8 U.S.C. § 1252(b)(6) provides that "[w]hen a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order." I do not believe we can circumvent Congress's clear intention to allow aliens only one opportunity to seek review of a motion to reopen as part of the review of the order of removal before a court of appeals by reading the APA to provide jurisdiction to the district court.

For decades, Congress has expressed its desire to streamline immigration proceedings, endeavoring to "create a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens from the United States." H.R. Rep. No. 72, 109th Cong., 1st Sess., reprinted in 2005 U.S.C.C.A.N. 240, 297 (2005) (quoting H.R. Rep. No. 1086, 87th Cong. 1st Sess.,

4

reprinted in 1963 U.S.C.C.A.N. 2950, 2966 (1961)).[5] "Congress's 'fundamental purpose' was 'to abbreviate the process of judicial review of deportation orders' and to 'eliminat[e] the previous initial step in obtaining judicial review – a suit in a District Court.'" Id. (quoting Foti v. INS, 375 U.S. 217, 224 (1963)).

"Congress continued these streamlining reforms when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, 110 Stat. 3546 (Sept. 30, 1996)." Id. at 298. The amendments in

---

[5] "Before [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996], individuals who were 'ineligible for admission into the United States and were never admitted into the United States were referred to as 'excludable,' while aliens who had gained admission, but later became subject to expulsion from the United States, were referred to as 'deportable.'' After IIRIRA, aliens who were previously referred to as 'excludable' are termed 'inadmissible,' and the term 'removal proceedings' covers proceedings applicable to both inadmissible and deportable aliens. Thus, a reference to an order of removal would encompass an order of deportation." Avila-Macias v. Ashcroft, 328 F.3d 108, 111 (3d Cir. 2003).

"The Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135 (2002), eliminated the Immigration and Naturalization Service ("INS") and assigned INS's enforcement functions to the [Department of Homeland Security]'s Bureau of Immigration and Customs Enforcement ("ICE")." Khouzam v. Atty. Gen'l, 549 F.3d 235, 243 n.7 (3d Cir. 2008).

5

IIRIRA "were intended to preclude all district court review of any issue raised in a removal proceeding." Id. The 2005 amendments were directed at correcting anomalies created by the Supreme Court's decision in I.N.S. v. St. Cyr, 533 U.S. 289 (2001) with respect to judicial review of the removal proceedings for criminal aliens. One purpose of the amendments was to ensure that "all aliens will get review in the same forum – the courts of appeals." 2005 U.S.C.C.A.N. at 299. The amendment "would give every alien one day in the court of appeals, satisfying constitutional concerns." Id. "By placing all review in the courts of appeals, [the amendments] would provide an 'adequate and effective' alternative to habeas corpus." Id. at 300 (quoting St. Cyr, 533 U.S. at 381).

Further, Congress's action in consolidating review of motions to reopen with review of the order of removal is consistent with the established practice in appellate review of civil cases involving motions to reconsider, motions to reopen, and decisions vacating default judgment. For example, "[o]rders granting a motion to vacate [default judgment] should be treated in the same way as orders granting a new trial [both of which] set[] the stage for further trial court proceedings [and are] not final. Appeal is properly taken upon conclusion of the proceedings set in motion by the order vacating the judgment." 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3916 (2d ed.) (footnotes omitted). Indeed, "[a]n order granting a new trial . . . ordinarily is not final; review is supposed to be available only after completion of the new trial." Id. at § 3915.5. "Denial of immediate appeal from an order granting a new trial means that the order merges in, and is reviewable on appeal from, the final judgment entered after

6

the new trial or other event that concludes the litigation." Id. "Few theories are likely to help a party who is anxious to bend the final judgment rule to permit appeal from an order granting a new trial." Id.

"Congress is expected to legislate against the backdrop of well-established common law principles." Duvall v. Att'y Gen., 436 F.3d 382, 387 (3d Cir. 2006). That is exactly what Congess did in enacting § 1252(b)(6) – Congress recognized the principle that in granting a motion to reopen, the BIA sets in motion a new proceeding, which should be allowed to continue to its conclusion before review is sought of any stage of that proceeding. By seeking review of the decision reopening his removal proceedings in the District Court, Chehazeh sought to bypass the procedures established by Congress based on common law principles.

Given the clear directive of § 1252(b)(6), I find the majority's discussion of 8 U.S.C. § 1252(g) to be unnecessary to the analysis of the question before us.[6] Congress has removed any ambiguity regarding when review of a decision on a motion to reopen or reconsider is to be had. That review is before the appropriate court of appeals, in conjunction with the review of the order of removal. The majority expressed great concern that "§ 1252(g) effectively becomes a 'do-over' provision." Majority Dec. at 32. Rather than insulating

---

[6] I find the majority's discussion of Kucana v. Holder, 130 S.Ct. 827 (2010) unnecessary. Although the government moved to reopen pursuant to a regulation, as discussed supra, I do not find that the decision to reopen under 8 C.F.R. § 1208.24 is discretionary. Therefore, the distinction between statutory and regulatory discretion is not necessary to the resolution of this case.

decisions to reopen and reconsider from review, Congress provided an explicit mechanism for an alien to obtain review of these decisions. I therefore cannot share the majority's concern that aliens will be prevented from seeking review of a decision to reopen. To be sure, that review will be delayed until a final order of removal is entered, but I perceive no harm to the alien in following that procedure since it reflects Congress's legislative intent in adopting the REAL ID Act and there is no constitutional violation resulting from such a procedure.

To the contrary, I fear that the majority's decision will create a situation similar to that in <u>Duvall</u> where our Court expressed concern that Duvall's refusal to testify as to her citizenship during her removal proceeding "would effectively preclude the INS from ever relitigating the issue of alienage or ever securing removal, despite the alien's ongoing criminal conduct." <u>Duvall</u>, 436 F.3d at 391. Here, the government presented evidence to the BIA that Chehazeh may have committed fraud during his original asylum application proceeding. The BIA reopened the matter and remanded to an immigration judge so that the evidence could be presented more fully and the allegations of fraud evaluated by the appropriate factfinder. By allowing Chehazeh to seek review of the decision to reopen before the District Court, absent a full exploration of the facts by an immigration judge, the majority creates a situation where an alien could lie during their asylum proceeding, and then never be put to task regarding that lie before the immigration authorities.

In satisfying the third factor — finality of the agency's decision — the majority applies the collateral order doctrine. Analogizing to review of a post-judgment order in a criminal proceeding where double jeopardy concerns exist, the

8

majority finds that the BIA's decision to reopen is effectively unreviewable if left until a later time in the litigation. Majority Dec. at 39-43. I disagree with this conclusion for several reasons. Most importantly, in the statute Congress has explicitly provided for review of the BIA's decision to reopen. Second, both the Supreme Court and our Court have consistently held that application of the collateral order doctrine should be the exception, not the rule. Third, I am disinclined to imbue immigration proceedings with the constitutional protections associated with double jeopardy review.

Having already discussed the statutory directive set forth in § 1252(b)(6), I turn to the general principles underlying application of the collateral order doctrine. The Supreme Court has emphasized its view that the collateral order doctrine should be invoked rarely.[7] Mohawk Indus., Inc. v. Carpenter, 130 S.Ct. 599 (2009). That is, "[i]n applying Cohen's collateral order doctrine, we have stressed that it must 'never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered.'" Id. at 605 (quoting Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994)).

Given these strong statements on the narrow scope of the collateral order doctrine, I do not think it is applicable

---

[7] "[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope." Will v. Hallock, 546 U.S. 345, 350 (2006). "[A]lthough the Court has been asked many times to expand the 'small class' of collaterally appealable order, we have instead kept it narrow and selective in its membership." Id.

here. The majority analogizes the present situation to that in Abney v. United States, 431 U.S. 651 (1977), where the collateral order doctrine was applied to prevent the government from "using its resources and power . . . to make repeated attempts to convict an individual," and to protect the individual from the concomitant "embarrassment, expense and ordeal" associated with multiple prosecutions. Id. at 661-62. Specifically, the Supreme Court concluded that an order denying a defendant's motion to dismiss an indictment on double jeopardy grounds was reviewable under the collateral order doctrine. The Court noted that "the very nature of a double jeopardy claim is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial." Id. at 659.

The situation presented by this case differs from that in Abney in important ways. The issues raised in the motion to reopen are not collateral to or separable from the issues underlying the asylum application. Rather, the new facts introduced by the government directly address, among other points, the question of whether or not Chehazeh committed fraud during the original asylum proceeding.

Additionally, as the Supreme Court has observed, "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime. . . . Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing." I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984).

Further, our court has noted that "[w]hile an alien may be eligible for a grant of asylum or an adjustment of status

10

under the immigration laws, he is not entitled to such benefits as a constitutional matter.  There is no constitutional right to asylum per se.  An alien seeking admission to the United States through asylum 'requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.'" Mudric v. Att'y Gen., 469 F.3d 94, 98 (3d Cir. 2006) (quoting Marincas v. Lewis, 92 F.3d 195, 203 (3d Cir. 1996)) (internal citations omitted).

With those admonitions in mind, I turn to the third prong of the collateral order test — whether the matter at hand will be effectively unreviewable later.  The Supreme Court discussed this factor in Mohawk Indus.  There, the Court observed that

> "the third Cohen question, whether a right is 'adequately vindicable' or 'effectively reviewable,' simply cannot be answered without a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement."  That a ruling "may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment . . . has never sufficed." Instead, the decisive consideration is whether delaying review until the entry of final judgment "would imperil a substantial public interest" or

11

> "some particular value of a high
> order."

Id. at 605 (quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 42 (1995); Digital Equip., 511 U.S. at 872, 878-879; and Will v. Hallock, 546 U.S. 345, 352-353 (2006)).

The majority expresses concern over the government's ability to continue to challenge Chehazeh's grant of asylum, forcing him to relitigate an issue that was already decided. Majority Dec. at 39. I do not share that concern. The issue that will be addressed in the reopened proceeding is the question of whether or not Chehazeh committed fraud during his original asylum application. Requiring Chehazeh to defend himself in a second proceeding does not "imperil a substantial public interest." To the contrary, I believe thoroughly examining the possible fraud in his original asylum application is a substantial public interest that should be protected. Relitigating his asylum application may place an additional burden on Chehazeh, but that burden is not insurmountable, and is presumably an unusual circumstance.

Further, 8 U.S.C. § 1252(b)(6) requires that review of a motion to reopen be consolidated with the review of the removal order. Congress has spoken clearly on this issue and concluded that review should be had in a single appeal. As a result, Chehazeh would be able to obtain review of the motion to reopen in the future.

Motions to reopen are filed often in immigration proceedings, and some of those motions are granted. In most, if not all, of those cases, the litigants seek review in the appropriate court of appeals, as required by the statute. The only aspect of this case that makes it, as the majority notes,

12

"highly unusual" is Chehazeh's decision to seek review in the District Court, rather than before us. [8]  In the REAL ID Act,

---

[8]  Had Chehazeh sought review before our court in the first instance, I would have dismissed the appeal as untimely, as is our normal practice.  See, e.g., Dajuste v. Att'y Gen., C.A. No. 11-2652 (3d Cir. Aug. 2, 2011) (order) (dismissing the petition for review for lack of jurisdiction because the motion to reopen was granted and the proceedings are therefore ongoing before the immigration judge).  The parties would then have been able to develop the factual record before an immigration judge, rather than before the District Court, as the majority directs.

The majority cites Kumarasamy v. Att'y Gen., 453 F.3d 169 (3d Cir. 2006), for the proposition that review is available in the courts of appeals only from a final order of removal.  In Kumarasamy, the alien, who had been removed from this country, sought habeas review in the district court, arguing that the removal was illegal since no order of removal existed.  The alien persisted in this argument, even after the government submitted a copy of the order of removal.  The district court dismissed the habeas petition for lack of jurisdiction.

13

Congress clearly vested responsibility for review of BIA decisions with the courts of appeals. <u>See</u>, <u>e.g.</u>, 8 U.S.C. § 1252(a)(2)(D). By filing his petition seeking review of the BIA's decision to reopen his case with the District Court, Chehazeh attempted to circumvent the method of review established by Congress. I cannot condone his attempt to do so. I would affirm the District Court's decision finding that it lacks jurisdiction to hear this matter.[9]

---

While the appeal was pending, Congress enacted the REAL ID Act, which vested jurisdiction for review of orders of removal with the courts of appeals. The REAL ID Act also required that habeas petitions challenging orders of removal before district courts or pending on appeal would be converted to petitions for review of the removal order. We concluded that Kumarasamy's habeas appeal should not be converted to a petition for review since Kumarasamy argued that no order of removal existed.

Here, no order of removal exists because Chehazeh sought, by filing for review before the District Court, to avoid the procedures established by Congress. If the established procedures are allowed to go forward as provided in the statute, and as is the normal practice in civil cases, Chehazeh will be able to obtain review of the decision reopening the case upon conclusion of the proceedings.

[9] I would also conclude that Chehazeh was not in custody for purposes of habeas jurisdiction.