NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2583
_____

UNITED STATES OF AMERICA

v.

RODNEY HOWARD,
                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. Action No. 2:15-cr-00008-001)
District Judge: Honorable Mark R. Hornak
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 22, 2018
_____

Before: GREENAWAY, JR., KRAUSE, *Circuit Judges*, and JONES,[*] *District Judge*.

(Opinion Filed:  April 4, 2018)
_____

OPINION[**]
_____

---

[*] The Honorable Judge John E. Jones, United States District Court Judge for the Middle District of Pennsylvania, sitting by designation.

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

Appellant Rodney Howard was convicted of one count of possession with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C § 841(a)(1). On appeal, he contends that the District Court erred by denying his *Batson* challenge and suppression motion, as well as by giving an allegedly improper jury instruction regarding consciousness of guilt. For the reasons set forth below, we will affirm the District Court's judgment of conviction.

## I. FACTS

### A. HOWARD'S DRUG OPERATION

Police responded to a fatal shooting in Pittsburgh, PA, in January 2014. An eyewitness identified Howard as the culprit, and a federal warrant was subsequently issued for his arrest. Howard fled the scene, causing members of the Western Pennsylvania Fugitive Task Force ("Task Force") to search for his whereabouts. After searching for eight months, the Task Force received information that Howard was located at a duplex on Clairton Boulevard in Pittsburgh, PA, where he was allegedly dealing heroin.

Task Force officers commenced surveillance of the residence on September 15, 2014. The next day, they observed a woman—later identified as Howard's former girlfriend Cheyanne Arrington—walk to the rear of the duplex, stop under a second-floor window, and wait while someone from the window dropped an object to her. She then walked to and entered a nearby restaurant, exited empty handed after a few minutes, and eventually returned to the Clairton Boulevard duplex.

A day later, Task Force officers observed a man walk up to the same second-story window, communicate with someone inside, and then enter the duplex through the front door. A second man later arrived in a vehicle and entered, and both men eventually left together.

On September 18, 2014, the Task Force assembled an arrest team. A deputy marshal knocked on the front door of the duplex and announced that the police were there. The officers heard only silence from the vacant first-floor apartment, but they heard movement on the second floor. The officers continued to knock until Howard appeared from a second-floor window and yelled, "I'm coming out. I'm an innocent man." App. 219.

After "30 to 50 seconds" passed without Howard emerging, the officers breached the door and entered into the duplex, where they found a staircase leading to the second-floor apartment. App. 220. There, the Task Force team heard movements in the apartment, which they believed were the sounds of people barricading themselves in the residence. The deputy marshal gave commands to the people inside to open the door slowly and come out with their hands up. Howard fully complied, and stated "don't shoot, don't shoot" as he slowly emerged. App. 226-27. The Task Force officers believed that there were still multiple people upstairs, and they continued to call up until a second person, Arrington, descended. Both Howard and Arrington were handcuffed in the entryway and detained on the front porch without incident.

The officers asked Howard and Arrington whether anyone else was upstairs, but neither responded. They therefore decided to conduct a protective sweep of the second-floor apartment. Accordingly, they entered the upstairs apartment, but they did not find

3

anyone else there – instead, in plain view on the kitchen counter, they found several bricks of heroin, empty stamp bags, and other heroin-processing paraphernalia. Once a warrant was issued, police officers searched the residence and seized the contraband. In all, officers recovered approximately 4,700 bags of heroin, as well as tens of thousands of empty bags, grinders, sifters, dust masks, and cutting agents.

Howard was indicted in January 2015 on one count of possession with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C § 841(a)(1). Before trial, Howard moved to suppress the evidence. The District Court denied the motion, crediting the Government's position that "the information known to Task Force members at the time was sufficient to believe another individual was in the Residence and that someone (or someones) posed a danger to those on the arrest scene." App. 14. Howard then proceeded to trial.

### B. HOWARD'S *BATSON* CHALLENGE

At trial, forty-five prospective jurors were originally included in the venire, four of whom were African-American: #112, 122, 144, and 161. The pool was reduced to thirty-two after the District Court asked various voir dire questions, and of those remaining, twenty-eight were slated as potential jurors and four as alternates. In that process, Prospective Juror #161 was dismissed for cause for health reasons, and Prospective Juror #144 was seated as an alternate, with neither side challenging him for cause. Accordingly, two African-American veniremen—Prospective Jurors #112 and #122—were eligible to be seated as jurors.

4

Prospective Juror #112, was called by the District Court for individual voir dire based on her answers to a questionnaire provided by the District Court. She said that she had been arrested for drug possession; one of her sons awaited trial on homicide charges; another son had been convicted of a drug felony; another relative had been convicted of arson; several family members were drug addicts; and that she herself was the victim of a crime. After answering that her experiences could "possibly" affect her ability to judge the case, Prospective Juror #112 then stated that she could put her personal experience aside to be an impartial juror. App. 526. On this basis, the District Court denied the prosecutor's motion to strike Prospective Juror #112 for cause, but invited either party to use a peremptory strike against her. The prosecutor did so, and peremptorily struck Prospective Juror #112.

Conversely, Prospective Juror #122 had no affirmative answers to the District Court's voir dire questionnaire. He only spoke briefly to communicate, *inter alia*, that he was fifty years old, that he had a high school education, that he was employed by Eat 'N Park, and that he was neither married nor had children. The prosecutor also used a peremptory strike against Prospective Juror #122 on the basis that "he had an odd demeanor" which made counsel "wonder if he was fully apprehending what was going on, and if he would be able to deliberate with the other jurors." App. 642. In response, Howard raised a *Batson* challenge, arguing that the prosecutor's reason was a pretext for racial discrimination on the premise that the prosecutor had used peremptory strikes to remove both African-American veniremen from the jury pool.

5

The District Court denied the challenge. It first found that there was a race-neutral reason to strike Prospective Juror #112 because she "presented information about the reality of her life experience and life history" that would have an "impact on her." App. 646. From this, the District Court concluded that Howard could not establish a pattern of race-based peremptory strikes because "striking the one remaining African-American . . . [does not] in and of itself create[] the inference." App. 649. And although the District Court disagreed with the prosecutor's assessment of the extent of Prospective Juror #122's "limitations," the District Court noted that "the purpose of peremptory challenges are for counsel to use their best judgment as to who should and should not sit on the jury." App. 654. Accordingly, the District Court concluded that Howard could not make a prima facie case under *Batson*.

The District Court *sua sponte* supplemented its ruling two days later. Relying on *United States v. Adigun*, 609 F. App'x 718 (3d Cir. 2015)[1], the District Court articulated as follows the burden that a defendant must meet to establish a prima facie case under *Batson*:

> [F]irst [the defendant] must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.

[1] We note that *Adigun* is of no moment and has no persuasive value over us because "[t]he court by tradition does not cite to its not precedential opinions as authority." Internal Operating Procedures of the United States Court of Appeals for the Third Circuit, 5.7 - Citations (January 2017); *see also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218 n.16 (3d Cir. 2017) ("[W]e are bound by our precedent and our custom not to rely on not precedential opinions of our Court"); *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 127 n.12 (3d Cir. 2012) ("Not precedential opinions are, by definition, not binding on this Court, and our internal operating procedures do not allow us to cite and rely upon those opinions.").

6

> Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.
>
> Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire men from the petit jury on account of their race.

App. 869. The District Court also added that it should "consider all relevant circumstances" when deciding if a requisite showing has been made, including a pattern of strikes against African-American jurors and the prosecutor's questions and statements during voir dire examination. App. 870. Once a prima facie case has been properly made, the District Court continued, then "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors" to "articulate a neutral explanation related to the particular case to be tried" and that the "trial Court will then have the duty to determine if the defendant has established purposeful discrimination." App. 870-71.

Applying this standard, the District Court reiterated that Howard failed to establish a prima facie case of discrimination. It repeated that "there was no pattern of strikes against black jurors" and that it found "no other evidence" of race based discrimination after reviewing the "the entire voir dire process and the questions that were asked." App. 877, 879. It also noted that the prosecutor had fulfilled her heightened duty as an officer of the court by striking a prospective juror that she believed could "get in the way of the defendant getting a fair trial." App. 879.

7

The District Court then held that, even if the prima facie case had been made, the prosecutor provided an adequate race-neutral explanation for the strike because it was "objectively visible [to the District Court] . . . in the courtroom," that Prospective Juror #122 had "a hesitation [or] a difficulty in communicating" when he was reading from the questionnaire. App. 880. Accordingly, the District Court reaffirmed its denial of Howard's *Batson* claim.

Howard was convicted of the drug charge in May 2016. This timely appeal followed.

**III. DISCUSSION**[2]

On appeal, Howard contends that the District Court erred by denying his *Batson* challenge and suppression motion, as well as by issuing an allegedly improper jury instruction regarding consciousness of guilt.

**A. *BATSON* CHALLENGE**

The Supreme Court has articulated the *Batson* test as follows:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

*Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 476-77 (2008)).  Here, Howard contends that the District Court applied the wrong legal standard because it only considered whether the strikes against Prospective Jurors #112 and #122 constituted a pattern of strikes against African-American veniremen.

However, we need not consider Howard's argument regarding his prima facie case in light of the fact that the District Court appropriately found in the alternative that the prosecutor provided an adequate race-neutral explanation for striking each juror.  We review this determination for clear error and will affirm unless the District Court's decision "is completely devoid of minimum evidentiary support displaying some hue of credibility" or "bears no rational relationship to the supportive evidentiary data." *United States v. Uwaezhoke*, 995 F.2d 388, 394 (3d Cir. 1993) (quoting *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 92 (3d Cir. 1992)).

As to Prospective Juror #112, the record reflects that she equivocated as to whether she could remain impartial towards the parties before answering that she could.  This, by itself, was sufficient to give the prosecutor pause over Prospective Juror #112's veracity and to strike her for cause.  *See United States v. Mitchell*, 690 F.3d 137, 141-42 (3d Cir. 2012) ("Bias that emerges in response to voir dire questioning can lead to excusal of a juror for cause or may facilitate the parties' intelligent exercise of peremptory strikes.").  It therefore follows that there was more than a sufficient basis for the prosecutor to peremptorily strike Prospective Juror #112 and to quell any challenge that the strike was pretextual, especially in light of the District Court's invitation to do so after it denied the prosecutor's for cause challenge.

9

As to Prospective Juror #122, the prosecutor's basis for the peremptory strike was that "he had an odd demeanor" which made counsel "wonder if he was fully apprehending what was going on, and if he would be able to deliberate with the other jurors." App. 642. The District Court held that this was an adequate race-neutral reason for the strike because it was "objectively visible [to the District Court] . . . in the courtroom" that Prospective Juror #122 had "a hesitation [or] a difficulty in communicating" when he was reading from the questionnaire. App. 880. That the District Court observed a degree of limitation is of great import because "[t]he *Batson* standard . . . places great confidence in the ability of trial judges to assess whether discrimination is at work based on the evidence at hand." *Holloway v. Horn*, 355 F.3d 707, 728 (3d Cir. 2004); *see also Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986) ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). Thus, the District Court adequately found that the prosecutor provided an acceptable race-neutral justification for peremptorily striking Prospective Juror #122. *See United States v. Casper*, 956 F.2d 416, 418 (3d Cir. 1992) ("A district court may also choose to accept the prosecution's explanation as race neutral where it rests upon the prosecution's evaluation of a venireperson's credibility and demeanor.").

Accordingly, even had Howard been able to make a prima facie case of discrimination, we hold that the prosecutor provided an adequate race-neutral explanation for each strike, thereby properly rebutting Howard's claim and ending our *Batson* inquiry.[3]

---

[3] Additionally, in his reply brief, Howard requested that this Court review the prosecutors' notes that the District Court collected. On January 10, 2018, we requested the District

## B. <u>SUPPRESSION MOTION</u>

Howard also challenges the District Court's denial of his suppression motion, contending that the Task Force's protective sweep of the second floor unit violated his Fourth Amendment rights. "This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

A protective sweep is permitted, *inter alia*, when officers possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Here, the District Court relied on five discrete findings to determine that the reasonable suspicion standard was met: (1) "Task Force members reported hearing a great deal of noise coming from upstairs, and at least one testified that he thought there were likely multiple people up there from the amount of noise heard"; (2) "although the Task Force knew from the noise that people were inside, no one answered the door over the course of thirty to fifty seconds after they knocked and announced themselves"; (3) "the Task Force had been briefed that there was a 'lot of activity' at the Residence in the days leading up to the arrest, and [a detective] had recently seen at least two other individuals (in addition to

---

Court to transmit the notes for our review, and, upon inspection, found no evidence of a *Batson* violation. We therefore find that there is no evidence in the notes that the prosecutors' proffered reason for striking Prospective Juror #122 was pretextual.

11

Mr. Howard and Ms. Arrington) entering and exiting the Residence"; (4) "the Task Force members knew that the arrest warrant they had for the Defendant was for homicide and that the weapon used in that felony was an assault rifle which had yet to be recovered"; and (5) "although not dispositive, neither Mr. Howard nor Ms. Arrington confirmed for the Task Force that no one else was present upstairs in the immediate aftermath of their arrests." App. 16-17 (footnotes and citations omitted).

According to Howard, the Task Force officers did not have articulable facts to support a reasonable belief that dangerous individuals remained inside, and that the protective sweep was impermissibly conducted based on standard procedure. We disagree on both accounts. The District Court's factual findings justify that a "reasonable suspicion" of danger existed, especially in light of the fact that this requirement "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997) (protective sweep justifiable when "officers had an articulable basis to believe that a confederate of those apprehended was still at large or within the premises and that a weapon previously sighted and not yet recovered might be available within the premises"), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209-11 (3d Cir. 2007). We therefore agree with the District Court that the Task Force acted in light of these facts, and not pursuant to a standard operating procedure. The sweep was done consistent with the Fourth Amendment, and we will affirm the District Court's denial of Howard's suppression motion.

12

## C. <u>JURY INSTRUCTIONS</u>

At trial, the District Court included a jury instruction that circumstantial proof of evidence having been destroyed—in the form of bleached heroin and stamp bags, as well as digital scales, being recovered from the trash—could be used to infer consciousness of guilt. On appeal, Howard objects to this instruction, contending that it should not have been given in light of an alleged lack of direct evidence that he destroyed heroin, stamp bags, and digital scales in the apartment just before surrendering to the Task Force. We review his objection to the jury instruction for abuse of discretion, *see United States v. Hoffecker*, 530 F.3d 137, 156 (3d Cir. 2008), and will reverse "only when the district court's decision is 'arbitrary, fanciful, or clearly unreasonable'" or "no reasonable person would adopt the district court's view," *United States v. Steiner*, 847 F.3d 103, 110 (3d Cir. 2017) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)).

We reject Howard's contention that the jury instruction's reliance on circumstantial evidence was sufficient to make them erroneous. *Cf. United States v. Pearlstein*, 576 F.2d 531, 541 (3d Cir. 1978) ("In the absence of direct evidence, however, the requisite knowledge and intent can be demonstrated circumstantially"); *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017) ("The necessary knowledge and intent can be proved by circumstantial evidence." (quoting *United States v. Rodriguez*, 993 F.2d 1170, 1175 (5th Cir. 1993))); *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) ("[T]he government may defeat a sufficiency-of-the-evidence challenge on circumstantial evidence alone."). Here, there was adequate evidence of Howard's consciousness of guilt, including testimony from the prosecution's forensic scientist that Howard's finger or palm prints—

13

and *not* Arrington's—were found on cups and containers that contained the stamp bags or heroin residue as well as testimony from a drug-trafficking expert that Howard's behavior was consistent with an attempt to destroy evidence.[4]  The District Court therefore did not abuse its discretion by giving the jury instruction.[5]

## IV. CONCLUSION

For the reasons above, we will affirm the District Court's judgment of conviction.

---

[4] Howard unconvincingly relies on *United States v. Hawkes*, 753 F.2d 355 (4th Cir. 1985), as "the path to reversal" in this case.  Appellant Br. at 65.  Unlike here, in *Hawkes*, the Fourth Circuit held that the trial court erred in instructing the jury regarding intentional flight and consciousness of guilt because there was only tenuous circumstantial evidence that the defendant had fled the crime.  753 F.2d at 358.  *Hawkes* is therefore inapposite.

[5] Howard also contends that the District Court's refusal to apply an obstruction of justice sentencing enhancement evidences the ambivalent nature of the circumstantial evidence.  Such an enhancement, however, is applied when defendants "destroy[] or conceal[] . . . evidence that is material to an official investigation or judicial proceeding."  U.S. Sentencing Guidelines Manual § 3C1.1 cmt. n.4(D).  The District Court did not apply the enhancement because the ineffectual attempts to destroy or discard the evidence did not impact the investigation or prosecution and therefore has no bearing on the appropriateness of the consciousness of guilt instruction.